UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

MARK DANA GOLDBERG,   Case No. 6:12-bk-01783-CCJ
                                                  Chapter 7
    Debtor.
_____/

PHIL LABOON,

    Plaintiff,

v.   Adv. No. 6:12-ap-93-CCJ

MARK DANA GOLDBERG,

    Defendant.
_____/

## MEMORANDUM AFTER TRIAL

This case came before the Court for trial on September 23, 2014. For the reasons set forth below, the Court finds that a debt of $670,140.30, owed by the debtor to the plaintiff, Phil Laboon ("Laboon"), is nondischargeable for fraud under Section 523(a)(2)(A) of the Bankruptcy Code.

### Procedural History

Much of this case has been resolved on summary judgment by the collateral estoppel effect of a judgment from a prior state court action. By that judgment, the state court found in favor of the plaintiff and against the debtor in the amount of $670,140.30, for fraud and breach of fiduciary duty.[1] By the Complaint here, the plaintiff seeks to except that judgment debt from discharge claiming that the debt arises from the debtor's fraud and defalcation while acting in a

---

[1] (Plaintiff's Ex. 2).

1

fiduciary capacity under Section 523(a)(4)--Count I--and for fraud under Section 523(a)(2)(A)--Count II.[2]

The plaintiff moved for summary judgment on Count II only, arguing that the state court judgment established a debt for fraud under Section 523(a)(2)(A) by collateral estoppel.[3] At a prior hearing, the Court ruled on the record that the state court judgment establishes all of the elements of fraud under Section 523(a)(2)(A) *except* for that of justifiable reliance. The Court also concluded that it must determine the amount of damages attributable to that fraud as opposed to damages attributable to the debtor's breach of fiduciary duty.

As such, the only issues which the Court considered at trial were: (i) whether the plaintiff justifiably relied on the debtor's misrepresentations; and (ii) the amount of the judgment debt attributable to that fraud. In light of the Court's findings below, Count I will be denied as moot.

### Facts

Prior to the petition date, the plaintiff and the debtor met each other through the plaintiff's parents and agreed to start a joint venture in preconstruction real estate. The parties agreed to the following division of labor: the plaintiff would generate qualified sales leads through internet marketing, and the debtor would chase the plaintiff's leads to generate sales. The plaintiff and the debtor agreed to split the profit from each lead-derived sale.

In his conversations with the plaintiff before forming the joint venture, the debtor played up the potential for a tremendous profit in this preconstruction real estate enterprise. The debtor's promise of half of the profits from each lead-derived sale is what motivated the plaintiff to join the joint venture. The plaintiff testified that he could have sold the qualified leads he generated for $150 to $250 each, but the prospect of receiving a share of the profits was far more

---

[2] (Doc. No. 1).
[3] (Doc. No. 32).

appealing. For the debtor, the plaintiff's internet marketing skills had the potential to draw in enormous business in a very "hot" market for real estate.

In their business relationship, the plaintiff generated approximately 5,600 qualified leads, and the debtor collected hundreds of "reservations" derived from those leads. The quirk of preconstruction real estate is that a *reservation* does not necessarily mean a *closed sale*--the buyer could back out, or the construction project might never be completed. As such, brokers may book many *reservations*, but ultimately close fewer *sales* from which their commissions are derived. It is clear that the plaintiff understood this distinction.

In their frequent telephone calls, the plaintiff testified that the debtor would marvel over the tremendous success of their joint venture. Thus, for example, the debtor told the plaintiff that their joint venture had won a sports car in a sales contest, and that the plaintiff would make certain amounts of money. The plaintiff alleges that he took the debtor's statements to mean he would definitely be paid those amounts. The plaintiff's testimony, however, reveals that he also knew that the debtor measured success in terms of reservations gathered--not just sales closed.

The debtor's enthusiasm for the enterprise led the plaintiff to commit himself fully to the joint venture. The plaintiff abandoned his work as an internet marketing consultant and devoted his efforts--along with those of his three full-time employees to the joint venture.[4] In doing so, the plaintiff created marketing materials and a website that generated thousands of "qualified sales leads"--the contact information of individuals interested in a preconstruction real estate investment opportunity. The plaintiff testified that he could have sold these qualified leads for between $840,000.00 and $1,400,000.00.

---

[4] The plaintiff paid these employees out of his own pocket.

In the end, the debtor paid the plaintiff only $22,000.00 as his share of the lead-derived profits in the joint venture.

At some point, the plaintiff became suspicious that the debtor was using the plaintiff's qualified leads to close sales without sharing the profits through the joint venture.[5] Based upon the evidence presented at trial, the design of the marketing website made it possible for the debtor to cheat in this manner. Because the plaintiff's marketing website listed the *debtor's* contact information in addition to his own--at the debtor's insistence--it was possible for a qualified lead to contact the debtor directly with or without leaving contact information on the plaintiff's website. The plaintiff was, thus, left to trust that the debtor would credit lead-derived sales generated by him to the joint venture.

The plaintiff's suspicions were partially validated. When the debtor later presented a list of sales he claimed to have closed with leads generated outside of the joint venture, several of those leads matched qualified leads generated by the plaintiff.

The plaintiff demanded an accounting for his share of the profits from the joint venture. The debtor refused, reasoning that because the joint venture was only a part of the debtor's larger business which did not involve the plaintiff, and the plaintiff was not an owner of the joint venture *per se*, the plaintiff was not entitled to an accounting. After the debtor refused the plaintiff's demand for an accounting, the parties' relationship deteriorated.

---

[5] At trial the debtor offered explanations for the plaintiff's modest return from the joint venture, namely that (i) the economic downturn meant that certain preconstruction projects for which the joint venture had collected would not be built, and (ii) the debtor did not devote resources to chasing the plaintiff's leads because the debtor received a lower margin (because he split the profits with the plaintiff) from those sales than from sales closed using leads derived from other sources. To the extent that these explanations bear on *whether* the debtor made misrepresentations, this Court will not look behind the state court judgment which conclusively establishes that the debtor misrepresented the profitability of the joint venture and his intention to share profits from the joint venture. (*See* Plaintiff's Exs. 1 and 2).

Ultimately, the debtor sued the plaintiff in state court for breach of contract, and the plaintiff filed a counterclaim which included counts for fraud and breach of fiduciary duty.[6] The parties actively litigated the state court case through discovery, but the debtor failed to pursue his claims and did not appear at the state court trial.[7] Although the debtor did not appear at trial, the state court heard evidence and entered a final judgment.

By that judgment, the state court found in favor of the plaintiff on counts of fraud and breach of fiduciary duty. Specifically, the state court found that the debtor and the plaintiff "entered into a written agreement providing for the equal sharing of profits out of a business venture . . . . The [debtor] . . . owed a fiduciary duty to [the plaintiff] to refrain from self-dealing and breached that duty to [the plaintiff] by diverting funds away from the parties['] joint venture and into corporations controlled by him or to him personally".[8] "Further, [the debtor and his company] made fraudulent misrepresentations of fact to [the plaintiff] regarding both the intention to share profits with [the plaintiff] based upon the joint venture agreement and further as [to] the profitability of the joint venture".[9] As for damages, the state court found that "[a]s a direct and proximate result of the Breach of Fiduciary Duty *and* Fraud, [the plaintiff] has been damaged in the amount of [$670,140.30]".[10]

The state court derived the amount of damages from a set of the debtor's bank statements. That amount is equal to all deposits into the debtor's accounts from the time the joint venture

---

[6] (*See* Plaintiff's Ex. 8)
[7] The debtor offered three excuses for his failure to participate after dismissing his attorney. *First*, the debtor dismissed his attorney when he ran out of money to pay his fee; as a courtesy, the attorney stated that he would instruct the state court to send notices to the debtor directly, which the debtor claimed never happened. *Second*, the debtor's dismissed attorney never explained that the debtor could represent himself. *Third*, the debtor's wife was going to monitor the progress of the state court litigation, but failed to do so. Despite these excuses, it is clear that the debtor was aware of the proceedings against him and participated for some time before he dismissed his counsel. Moreover, the debtor failed to make any effort to obtain relief from the judgment in state court.
[8] (Plaintiff's Ex. 2 ¶ 5).
[9] (*Id.* ¶ 6).
[10] (*Id.* ¶ 7).

began.[11] The plaintiff testified that the state court awarded the total amount of the debtor's deposits--rather than only one-half as per the parties' agreement--because the debtor (i) failed to produce all of his bank records in response to plaintiff's discovery request and (ii) continued to market investments to the plaintiff's qualified leads without sharing profits after the parties' relationship deteriorated and the lawsuit began. The $670,140.30 amount was the state court's best estimate of the plaintiff's damages.

The plaintiff now seeks to except the state court judgment from discharge for fraud under Section 523(a)(2)(A) of the Bankruptcy Code.[12]

## Discussion

To establish nondischargeability for fraud under Section 523(a)(2)(A), the plaintiff must show the following four elements by a preponderance of the evidence[13]: "the debtor made a false statement with the purpose and intention of deceiving the creditor; the creditor relied on such false statement; the creditor's reliance on the false statement was justifiably founded; and the creditor sustained damage as a result of the false statement".[14]

The collateral estoppel effect of the state court judgment precludes this Court from considering all but the justifiable reliance element of fraud under Section 523(a)(2)(A) and the portion of damages attributable to that fraud.[15] The state court found that the debtor's misrepresentations extended to "both the intention to share profits with [the plaintiff] based upon the joint venture agreement and further as [to] the profitability of the joint venture".[16] The evidence presented in this Court establishes that the plaintiff justifiably relied on the debtor's

---

[11] (See Plaintiff's Ex. 5).
[12] As discussed above, Count I of the Complaint alleges nondischargeability under Section 523(a)(4). The Court has not heard evidence on Count I, but in light of the Court's ruling finding the debt nondischargeable, below, that Count is moot.
[13] Grogan v. Garner, 498 U.S. 279, 287 (1991).
[14] Fuller v. Johannessen (In re Johannessen), 76 F.3d 347, 350 (11th Cir. 1996).
[15] See Brown v. R.J. Reynolds Tobacco Co., 611 F.3d 1324, 1331–33 (11th Cir. 2010).
[16] (Plaintiff's Ex. 1 ¶ 6).

misrepresentations as to the debtor's intention to share profits of the joint venture, but not on the profitability of the joint venture.

Under the justifiable reliance standard, "a person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation".[17] "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than the application of a community standard of conduct to all cases".[18] As such, the plaintiff is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation", but this rule only applies when the plaintiff "is capable of appreciating [the misrepresentation's] falsity at the time by the use of his senses".[19]

The plaintiff justifiably relied on the debtor's intention to split the profits of the joint venture. First, it is clear that the plaintiff actually relied on the debtor's misrepresentations: hoping to receive half of the profits, the plaintiff devoted all of his own efforts and the efforts of three employees to generating qualified leads for the joint venture. Second, the Court concludes that the plaintiff's reliance was justified. The debtor was introduced to the plaintiff by the plaintiff's own parents who had--themselves--done business with the debtor. The plaintiff also spent a substantial amount of time working out the details of the joint venture with the debtor, including in person meetings and frequent phone calls. While the debtor was reluctant to reduce the agreement to writing, the plaintiff was satisfied at the time that this was merely to avoid dealing with lawyers. In any event, the debtor ultimately agreed to a written agreement. To the extent that the debtor diverted funds by closing sales with the plaintiff's leads and failing to

---

[17] *Field v. Mans*, 516 U.S. 59, 70 (1995) (internal quotation marks omitted).
[18] *Id.* (internal quotation marks omitted).
[19] *Id.* at 71 (internal quotation marks omitted).

7

credit the sales to the joint venture, it does not appear that the plaintiff was given cause to investigate until after the sales had occurred. When the plaintiff grew suspicious of the debtor, he immediately demanded an accounting and later filed a counterclaim in the state court proceeding. The plaintiff did not "blindly rely" on the debtor's misrepresentations. Instead, the plaintiff tried to familiarize himself with the debtor and the operation of the joint venture. Thus, the plaintiff justifiably relied on the debtor's misrepresentation that he would split the joint venture's profits with the plaintiff.

The plaintiff did not however, justifiably rely on the debtor's misrepresentations on the profitability of the joint venture. The plaintiff's testimony reveals that he knew that the profitability of the joint venture was contingent on closing *sales*, not merely taking *reservations*. When the debtor raved about the success of the joint enterprise--some of which the plaintiff testified was stated in terms of reservations collected--the plaintiff could have, and should have, asked the debtor to clarify whether he was speaking in terms of sales closed or reservations collected. In failing to do this, the plaintiff passed up "his opportunity to make a cursory examination or investigation".[20]

In any event, however, the plaintiff's justifiable reliance on the debtor's stated intention to share the profits with the plaintiff is sufficient to except the entire state court judgment from discharge for fraud. The $670,140.30 figure in the state court judgment appears to have been that court's best guess of the plaintiff's share of the profits in light of the debtor's continued marketing to the plaintiff's qualified leads outside of the joint venture and the debtor's failure to participate in the state court case after he dismissed his attorneys.[21]

---

[20] *See Field*, 516 U.S. at 70 (internal quotation marks omitted).
[21] The plaintiff suggests that he incurred additional damages for lost opportunities to sell his leads elsewhere and for money that he spent on the joint venture relying on the debtor's misrepresentations. Though it is not clear whether the plaintiff claimed these damages in state court, because he *could have* claimed these damages in state court as

## Conclusion

For the reasons set forth above, the Court finds that a debt of $670,140.30 is nondischargeable under Section 523(a)(2)(A) of the Bankruptcy Code.

Done and Ordered in Orlando, Florida, this 5th day of March, 2015.

/s/ Cynthia C. Jackson
CYNTHIA C. JACKSON
United States Bankruptcy Judge

Clerk's office to serve

---

part of the fraud counterclaim, he is precluded from seeking them here. *See Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1990).